**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **C. BUTLER, D. E. BURKEY,** | § | |
| **E. J. BRADLEY, J. T. CAMPBELL,** | § | |
| **T. EBINGER, M. GREEN,** | § | |
| **C. E. JOCHUM, K. J. MCENTEE,** | § | |
| **N. S. MILLER, T. R. MOFFETT,** | § | |
| **L. M. MOUTSANIDES, K. OLIVO,** | § | |
| **T. POTTS, C. E. ROMERO, JR.,** | § | |
| **T. RUDOLPH, N. RUHOFF, and** | § | |
| **W. A. WASHINGTON,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | **CIVIL ACTION NO.  4:23-cv-01936** |
| **v.** | § | |
| | § | |
| **ACCESS RESTORATION** | § | |
| **SERVICES US, INC.,** | § | |
| **GLOBAL ESTIMATING SERVICES,** | § | |
| **INC.,** | § | |
| **AUTUMN K. GARIBAY,** | § | |
| **NATHAN NORMOYLE,** | § | |
| **MICHAEL NEEDHAM, and** | § | |
| **GUISEPPE GAGLIANO,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

COME NOW, Plaintiffs C. Butler, D. E. Burkey, E. J. Bradley, J. T. Campbell, T. Ebinger,

M. Green, C. E. Jochum, K. J. McEntee, N. S. Miller, T. R. Moffett, L. M. Moutsanides, K. Olivo,

T. Potts, C. E. Romero, Jr., T. Rudolph, N. Ruhoff, and W. A. Washington, and through this suit

bring claims against Defendants Access Restoration Services US, Inc. ("ARS"), Global Estimating

Services, Inc. ("GES"), Autumn K. Garibay, Nathan Normoyle, Michael Needham, and Guiseppe

Gagliano, for breach of contract and related claims (against GES and ARS), tortious interference

with a contract (against ARS), and for violations of the Fair Labor Standards Act of 1938 ("FLSA")

(against all Defendants). Plaintiffs make the following allegations and statements to support their claims:

## I. JURISDICTION AND VENUE

1.        Venue is proper in Harris County, Texas, as Plaintiffs worked under a contractual term that stated that Plaintiffs and GES "agree to jurisdiction in the state or federal Courts of Harris County, Texas concerning any disputes related to this Agreement." Furthermore, both ARS and GES have their headquarters registered with the state of Texas at the same address in the city of Conroe, Montgomery County, Texas, which is within this federal district. The damages and issues claimed are within the jurisdictional limits of this Court. This Court has personal and subject matter jurisdiction over the parties to this suit. This Court has federal question jurisdiction over this suit pursuant to 28 U.S.C. § 1331, given Plaintiffs' claims under the Fair Labor Standards Act.

## II. FAIR LABOR STANDARDS ACT JURISDICTION AND COVERAGE ISSUES

2.        Pursuant to 29 U.S.C. 216(b), an action to recover unpaid wages and other damages under the Fair Labor Standards Act may be maintained against any employer in any state or federal court of competent jurisdiction.

3.        At all material times, Defendants have acted, directly or indirectly, in the interest of an "employer" with respect to Plaintiffs, pursuant to the FLSA.

4.        At all times hereinafter mentioned, Defendants have each been an "employer" within the meaning set out in Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

5.        At all times hereinafter mentioned, Defendant GES[1] has been an enterprise within the meaning set out in Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

---

[1] As alleged in this complaint, all acts by and liabilities of GES are legally those of ARS as well, due to the fact that GES was acting as the alter ego of ARS.

6.      At all times hereinafter mentioned, Defendant GES has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, dealing in, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000 (exclusive of excise taxes).

7.      At all times hereinafter mentioned, Plaintiffs were individual employees who were engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. §§ 206-207.

8.      Plaintiffs, in their position as "field inspectors," were not exempt from the overtime provisions of the FLSA, and are therefore covered by the overtime provisions of the FLSA.

9.      ARS and GES were a joint enterprise for purposes of FLSA applicability and liability.

### III.  PARTIES

10.      Plaintiff Carlos Butler ("C. Butler" and "Butler") is an individual resident of Ascension Parish, Louisiana.

11.      Plaintiff David E. Burkey ("D. E. Burkey" and "Burkey") is an individual resident of Arapahoe County, Colorado.

12.      Plaintiff Eric J. Bradley ("E. J. Bradley" and "Bradley") is an individual resident of East Baton Rouge Parish, Louisiana.

13.      Plaintiff Jeremy T. Campbell ("J. T. Campbell" and "Campbell") is an individual resident of DeSoto Parish, Louisiana.

14.      Plaintiff Tyler Ebinger ("T. Ebinger" and "Ebinger") is an individual resident of Fulton County, Georgia.

15.     Plaintiff Malcolm Green ("M. Green" and "Green") is an individual resident of Harris County, Texas.

16.      Plaintiff Chas E. Jochum ("C. E. Jochum" and "Jochum") is an individual resident of St. Martin Parish, Louisiana.

17.     Plaintiff Kevin J. McEntee ("K. J. McEntee" and "McEntee") is an individual resident of El Paso County, Colorado.

18.     Plaintiff Natalie S. Miller ("N. S. Miller" and "Miller") is an individual resident of Lubbock County, Texas.

19.     Plaintiff Timothy R. Moffett ("T. R. Moffett" and "Moffett") is an individual resident of Douglas County, Oregon.

20.     Plaintiff Lisa M. Moutsanides ("L. M. Moutsanides" and "Moutsanides") is an individual resident of Douglas County, Oregon.

21.     Plaintiff Kimberly Olivo ("K. Olivo" and "Olivo") is an individual resident of Bexar County, Texas.

22.     Plaintiff Trevon Potts ("T. Potts" and "Potts") is an individual resident of Bexar County, Texas.

23.     Plaintiff Cesar E. Romero, Jr. ("C. E. Romero, Jr." and "Romero, Jr.") is an individual resident of Maricopa County, Arizona.

24.     Plaintiff Tracy Rudolph ("T. Rudolph" and "Rudolph") is an individual resident of Mobile County, Alabama.

25.     Plaintiff Nathaniel Ruhoff ("N. Ruhoff") is an individual resident of Guadalupe County, Texas.

26.     Plaintiff Warren A. Washington ("W. A. Washington") is an individual resident of Mobile County, Alabama.

27.     Defendant Access Restoration Services US, Inc. is a foreign for-profit corporation registered in and doing business in the state of Texas. ARS was originally incorporated in the state of Delaware on September 18, 2017. ARS was subsequently registered in the state of Texas on January 5, 2022. ARS may be served with summons by serving its Texas registered agent as follows:

Andrews Meyers PC
1885 St James Place 15th Floor
Houston, TX 77056

28.     Defendant Global Estimating Services, Inc. is a foreign for-profit corporation, registered in and doing business in the state of Texas. GES may be served with summons by serving its Texas registered agent as follows:

C T Corporation System
1999 Bryan St. Suite 900
Dallas, TX 75201-3136 USA

29.     Defendant Autumn K. Garibay ("Garibay") is an individual resident of Harris County, Texas. Defendant Garibay may be served with summons at her residential address[2] of:

23770 Springwoods Village Pkwy, Apt 314
Spring, Texas 77373-5097

During her employment with GES, Garibay moved from Arizona to Texas to act as general manager for GES and conducted the business activities of GES and ARS within the state of Texas.

---

[2] Upon information and belief, Garibay may be in the process of moving back to Arizona. Nevertheless, Plaintiffs anticipate being able to identify her present location and timely serve her with summons at the appropriate time.

30.     Defendant Michael Needham ("Needham") is an individual resident of Montgomery County, Texas. Defendant Needham may be served with summons at his business address of:

27657 Commerce Oaks Drive
Conroe, Texas 77385

During the facts relevant to this dispute, Needham conducted business on behalf of GES and ARS in the state of Texas.

31.     Defendant Nathan Normoyle ("Normoyle") is an individual resident of Harris County, Texas. He may be served with summons at his residential address of:

24819 Trull Brook Lane
Spring, Texas 77389

During the facts relevant to this dispute, Normoyle conducted business on behalf of GES and ARS in the state of Texas.

32.     Defendant Guiseppe Gagliano ("Gagliano") is an individual resident of the province of Ontario, Canada. He may be served with summons at his residential address of:

212 Dunvegan Road
Toronto, ON M5P 2P2, Canada

During the facts relevant to this dispute, Gagliano conducted business on behalf of GES and ARS in the state of Texas.

## IV. BACKGROUND FACTUAL ALLEGATIONS

33.     ARS is primarily involved in for-profit disaster remediation services in the United States and Canada. Per Texas Secretary of State records as well as its website,[3] the US corporate headquarters for ARS is located at 27657 Commerce Oaks Dr., Conroe, Texas.

34.     On April 21, 2023, ARS filed a lawsuit ("ARS/MMA Lawsuit") against the Houston law firm of McClenny, Moseley & Associates, PLLC ("MMA"). According to that lawsuit, on

---

[3] See <https://www.arsgem.com/contact>, last accessed May 25, 2023.

6

December 17, 2021, ARS wired MMA the amount of $3 million as an investment to provide capital for MMA to use toward lead generation to bring in clients who had property damage claims from the August-September 2021 Hurricane Ida catastrophic weather event. As alleged by ARS, MMA through its principal John Moseley promised ARS a return on its investment at a rate of 429% in 9 months or 572% in 12 months. This would come from MMA paying ARS a portion of MMA's contingency attorney fees.[4] ARS alleges that it hasn't seen a dime from that investment and has therefore sued MMA and Moseley for various causes of action. That case is pending as *Access Restoration Services US, Inc. vs. McClenny Moseley & Associates, PLLC, et al.,* Cause No. 2023-25422 in the 270th Judicial District Court of Harris County, Texas.

35.     Furthermore, on April 26, 2023, using the same attorneys from the ARS/MMA Lawsuit, GES sued MMA on a claim that MMA owes GES $9.8 million for invoices for GES's work for MMA ("GES/MMA Lawsuit"). That case is pending as *Global Estimating Services, Inc. v. McClenny Moseley & Associates, PLLC,* Cause No. 2023-26243 in the 133rd Judicial District Court of Harris County, Texas. Plaintiffs do not know at this time what contractual terms may exist between GES and MMA to substantiate GES's claim.[5] The relevance of these cases to the present suit will be described shortly.

36.     Plaintiffs performed the work of "field inspectors" for GES.[6] In this position, Plaintiffs would travel to the sites of property loss to document the damage to the properties. Plaintiffs would

---

[4] Fee-sharing with a non-lawyer is prohibited by Rule 5.04(a) of the Texas Disciplinary Rules of Professional Conduct.

[5] Both the ARS/MMA Lawsuit and the GES/MMA Lawsuit are curiously lean on the disclosure of the parties' contractual terms and other fact allegations, despite the substantial monetary claims being made in those cases.

[6] Any representation that Plaintiffs performed work "for GES" or that an action was taken "by GES" is for historical convenience only and is not to be deemed an admission that GES was not the alter ego of ARS.

merely document the property damage and transmit the information to GES's inside estimators. Although "field inspector" is an appropriate title for their position, to be clear, Plaintiffs did not actually "inspect" any properties to determine whether they conformed to any professional or regulatory standards. They merely "inspected" a site of property loss to document what damage they observed. As one Plaintiff describes it, the most discretion they exercised in this position was to determine whether a photo they took was too blurry and needed to be retaken.

37.     Plaintiffs understood that the residential claims on which they performed inspections in the field were for MMA clients. However, GES suspiciously instructed Plaintiffs never to speak to the lawyers at MMA concerning the property claim cases. Also suspiciously, GES instructed Plaintiffs to document *all* damage to the property, regardless of whether the damage was storm-related or not, and to keep their damage scope descriptions uncharacteristically vague. Even more suspiciously, GES refused to allow Plaintiffs to see any of the estimates performed by GES's inside estimators based on their inspections, or the insurance carrier estimates and cause of loss statements, despite the fact that all of the Plaintiffs were professionally certified to perform estimates. As one Plaintiff who has worked as an inside estimator describes it, in order to generate an accurate estimate, it is common for an inside estimator to communicate frequently with the field team for additional onsite information or clarification to help prepare a good faith, accurate estimate. However, GES did not want this exchange of information to take place.

38.     On or about January 5, 2022, ARS registered its DE-charted entity with the Texas Secretary of State as doing business in the state of Texas as a foreign for-profit corporation.

39.     On or about January 24, 2022, GES was created in the state of Delaware. On or about February 7, 2022, GES was registered with the Texas Secretary of State as doing business in the state of Texas as a foreign for-profit corporation.

40.      Both ARS and GES identify the same two individuals as each company's managers –
Defendant Guiseppe Gagliano and non-party Domenico Gagliano.[7] Both managers' addresses are
given as ARS's Texas headquarters address – 27657 Commerce Oaks Drive, Conroe, TX 77385
USA – in both registrations. The state registrations of GES and ARS both identify that same
address as the business address of both companies.

41.      Returning to the two MMA lawsuits, in the ARS/MMA Lawsuit, ARS claims damages
related to its $3 million investment. ARS claims that it was promised a return on the investment
that would apparently be in the $15M-$17M range. At the same time, in the GES/MMA Lawsuit,
GES is claiming that it is owed $9.8 million in unpaid invoices from MMA for the same period of
time. Plaintiffs wonder how ARS could have received a $15M-$17M return on its investment from
these claims if GES was simultaneously burdening MMA with almost $10M in debt for work on
those same claims.

42.      Upon information and belief, it appears that ARS set up GES to assist MMA in perpetrating
potential fraud against the residential insurers of MMA's clients. Upon information and belief, it
appears that ARS was likely using what were in fact inflated in-house property damage estimates
for MMA cases to increase the claim values in those cases. Inflated estimates, in theory, would
lead to higher claim values and therefore a more substantial return for ARS on its $3 million
investment.

43.      While Plaintiffs are not aware of what specific methods may have been used to potentially
inflate the property damage estimates (because of GES's own efforts to shield that information
from them), the fact that GES would instruct its field inspectors to document non-covered,
unrelated property damage, and to also leave the scope of damage sheets vague, would comport

---

[7] The Texas filing for GES erroneously identifies Domenico Gagliano as "Gagliano Domenico."

with Plaintiffs' theory that ARS was using GES to perpetrate a fraud through, in part, the in-house estimates. Due to the facts set out within this section both from the personal knowledge of the Plaintiffs as well as those allegations made in good faith upon information and belief, Plaintiffs allege that GES was acting as the alter ego of ARS to assist in perpetrating a fraud.

44.     On or about February 10, 2022, Plaintiffs Washington, Moutsanides, Jochum, and non-party Trevor Brill met with Defendants Normoyle, Needham, and Gagliano at a newly-leased office in Spring, Texas about becoming the first three field inspectors for GES, with Brill as a manager. While they were informed about the $82,000 salary rate for the position, Defendant Normoyle specifically told the four that their bonuses for their work would amount to twice their salary, to entice them into moving forward with GES.

45.     Normoyle is ARS's Vice President of Global Operations. Upon information and belief, Normoyle also served as President of GES throughout the employments of Plaintiffs. These three plaintiffs went forward with GES based on Normoyle's representations about the substantial bonuses they would be receiving.

46.     In preparation for this meeting, on February 9, 2022, Defendant Normoyle himself emailed human resources hiring documentation to Plaintiff Washington and informed Washington that Normoyle's executive assistant, Tana Brandsma (also apparently an ARS employee), would contact Washington for additional coordination.

47.     To perform the work for GES, Plaintiffs were issued equipment and vehicles that, upon information and belief, are/were likely owned by and/or leased by ARS.

48.     As described below, one-by-one, each Plaintiff came on board with GES as a field inspector, with a promise of these substantial bonuses but no other plan terms otherwise in place.

49.     In around July 2022, GES issued more details of the bonus agreement pursuant to which the GES field inspectors had been working. That bonus structure included three types of bonuses:

- A quality of site inspection bonus, which would be a fixed $2,000 bonus per quarter.

- A customer service quality bonus, which would also be a fixed $2,000 bonus per quarter.

- A variable bonus that would be based on the number of completed inspections, and that would provide the most substantial bonuses for the field inspectors.

All of the Plaintiffs in this case have earned bonuses pursuant to that stated bonus structure yet none of them have been paid a dime.

50.     Upon information and belief, and due to various interactions that various Plaintiffs had with ARS executives and managers, Plaintiffs contend that executives and managers from ARS, including Defendants Normoyle, Needham, and Gagliano, were regularly and frequently directing the operations of GES through general manager Autumn Garibay. It was obvious to at least some Plaintiffs (perhaps all) that Garibay lacked sufficient industry knowledge to effectively run the GES operation. More cynically, Plaintiffs contend that the alleged fraud using GES could not have been conducted without the direct coordination and control of ARS executives, and that Garibay was selected (in part) specifically due to her lack of appropriate industry knowledge.

51.     Throughout their employments, some Plaintiffs have complained that GES was late on their salary paychecks on at least a half-dozen occasions, demonstrating that GES was insufficiently capitalized for its operations, including the bonuses being promised. In fact, Plaintiffs are not aware of GES ever receiving revenue from its work for MMA clients, which, if true, would mean that ARS would likely have been funding the salaries and operations of GES throughout the company's existence. Therefore, upon information and belief, Plaintiffs contend that this was the case.

11

52.     On or about April 28, 2023, ARS human resources generalist Salena Ali sent out a letter to the field inspectors still employed by GES at that time, including many Plaintiffs in this case, that the company would be shutting down effective that day. To date, GES hasn't paid a single bonus to any of the Plaintiffs nor has GES even taken the basic act of issuing any bonus sheets to any of the Plaintiffs as stated in the written version of the bonus agreement. By this point, GES was already late for any bonuses earned by field inspectors for at least the calendar quarters of 2022 and Q1-2023.

53.     The day after the remaining team was terminated from GES, Plaintiff Jochum spoke with Garibay by phone and asked about his bonus. Garibay told him that he would not be getting a bonus, and refused to give him any information by which he could calculate the bonuses he believes he is owed.[8] On or about May 10, 2023, Jochum sent an extensive email setting out his concerns to various managers and executives at GES and ARS. During a call the following day, ARS HR representative Vince Wong[9] told Jochum that the field inspectors were never supposed

---

[8] As a result, Jochum's bonus claim stated in this complaint is based on his maximum possible bonus under the bonus agreement structure that was set out in writing a few months after Jochum had been employed.

[9] Despite being assigned an @ges.inc email address in addition to his standing ARS-issued email address, Wong publicly identifies his job position as "Corporate Human Resources Manager at ARS - Global Emergency Management / TGA Group" on LinkedIn. His LinkedIn profile and work history make no mention whatsoever of any employment or involvement with GES. See <https://ca.linkedin.com/in/vince-wong-82479978>, last accessed May 24, 2023. Nathan Normoyle was also assigned an @ges.inc email address in addition to his standing ARS email address, but similarly makes no mention of GES on his LinkedIn profile and work history. See <https://www.linkedin.com/in/nathan-normoyle>, last accessed May 24, 2023. Curiously, while Defendant Needham appears to also have been assigned an @ges.inc email address, a Google search on May 24, 2023 suggests that he had a LinkedIn profile that was recently removed. Furthermore, it appears that the cached version of his public LinkedIn page that might otherwise remain publicly available through Google has also been removed or deleted. Therefore, it is unknown what Needham publicly represented in that prior LinkedIn account.

to get bonuses. Essentially, Wong was confessing that the bonus promises all along had been a fraud on the field inspectors.

54.    Plaintiffs contend upon information and belief that executives and managers from ARS directed Garibay and GES not to issue bonuses to Plaintiffs or otherwise proceed with the company's contractual obligations under the bonus agreements. ARS was aware of the bonus agreements between GES and the Plaintiffs and in reality had created them. By so directing Garabay and GES, ARS was interfering with the contractual relationships between Plaintiffs and GES and proximately caused the Plaintiffs the loss of this compensation.

55.    There were other circumstances that demonstrated the interconnectedness of ARS and GES. Some examples:

- GES offer letters to the Plaintiffs were signed by Scott Jacobi, Chief Financial Officer of ARS.

- Gas cards were imprinted with the account name "ARS GES."

- On occasion, a Plaintiff has been paid directly by ARS rather than GES despite being ostensibly employed by GES.

- The companies' payroll provider has sometimes listed a Plaintiff as being employed by ARS rather than GES.

- While working in Florida, Plaintiffs were required to fill out ARS timesheets bearing the ARS logo.

- Also in Florida, ARS, GES, and MMA created a joint "campsite" to process Hurricane Ian claims.

- Many other executives and managers at ARS held mirror @ges.inc email addresses.

Plaintiffs believe that discovery in this case will yield additional ties, including many financial ties between ARS and GES in the companies' financial records (to which Plaintiffs have not had access) that substantiate Plaintiffs' allegations that GES was merely an alter ego of ARS.

**The field inspectors were non-exempt from the overtime provisions of the FLSA.**

56.     The field inspector plaintiffs in this case were non-exempt under the Fair Labor Standards Act of 1938. Their responsibility was to take photos of the property (whether damaged or not) and upload data into software that would prepare a sketch of the property. The field inspectors would then transmit that information to GES's inside estimators, who would (secretly) prepare the property damage estimates. The field inspectors' primary duty did not involve the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers. Furthermore, their primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance. In fact, the field inspectors were performing the manual "line work" of the services provided by GES, specifically the type of work that the FLSA and controlling case law describe as non-exempt work.

57.     All of the field inspectors in this case were paid on a salary basis.

58.     All of the field inspectors worked over 40 hours in more than one workweek during their respective employments with GES. For example, as their (ARS) timesheets would demonstrate, the inspectors frequently worked 12-hour days at their assigned work locations, especially for their work in Florida following Hurricane Ian, often exceeding 40 hours in a workweek.

59.     Because GES was only formed in January 2022, all of the overtime work described in this suit took place within 2 years from the date of filing of this suit. With that said, Plaintiffs still contend as a matter of course that Defendants' violations of the FLSA were willful.

60.     At no time were any of the Plaintiffs in this case paid an overtime premium for hours worked over 40 in a workweek, in violation of the FLSA.

**The individual bonus and overtime claims of the field inspector plaintiffs in this case**

61.     Plaintiff Butler worked for GES from on or about May 16, 2022 to on or about March 12, 2023 as a field inspector. Pursuant to the GES bonus structure, Butler is owed at least $4,000 for Q4-2022 and a currently unknown amount for his work in Q1-2023. Furthermore, during one or more workweeks during Butler's employment with GES, Butler worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

62.     Plaintiff Burkey worked for GES from on or about May 31, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Burkey is owed at least $47,000. Furthermore, during one or more workweeks during Burkey's employment with GES, Burkey worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

63.     Plaintiff Bradley worked for GES from on or about July 18, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Bradley is owed at least $32,000. Furthermore, during one or more workweeks during Bradley's employment with GES, Bradley worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

64.     Plaintiff Campbell worked for GES from on or about May 31, 2022 to on or about March 13, 2023 as a field inspector. Pursuant to the GES bonus structure, he is owed at least $57,000 for bonuses. Furthermore, during one or more workweeks during Campbell's employment with GES, Campbell worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

65.     Plaintiff Ebinger worked for GES from on or about May 23, 2022 to on or about April 28, 2023. Pursuant to the GES bonus structure, Ebinger is owed at least $40,000 in bonuses. Furthermore, during one or more workweeks during Ebinger's employment with GES, Ebinger worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

66.     Plaintiff Green worked for GES from on or about May 15, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Green is owed at least $47,000 in bonuses. Furthermore, during one or more workweeks during Green's employment with GES, Green worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

67.     Plaintiff Jochum worked for GES from on or about February 9, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, upon information and belief, and subject to data to be obtained in discovery, Jochum contends he is owed at least $80,000 for bonuses. Furthermore, during one or more workweeks during Jochum's employment with GES, Jochum worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

68.     Plaintiff Louis[10] worked for GES from on or about May 15, 2022 to on or about March 13, 2023 as a field inspector. Pursuant to the GES bonus structure, Louis is owed at least $62,500. Furthermore, during one or more workweeks during Louis's employment with GES, Louis worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

---

[10] Plaintiffs Louis, Moffett, and Washington had some supervisory duties in addition to substantial field inspector duties. Those Plaintiffs will contend that their substantial field inspector duties made them non-exempt under the FLSA.

69.    Plaintiff McEntee worked for GES from on or about March 23, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, McEntee is owed at least $33,600. Furthermore, during one or more workweeks during McEntee's employment with GES, McEntee worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

70.    Plaintiff Miller worked for GES from on or about May 9, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Miller is owed at least $31,000. Furthermore, during one or more workweeks during Miller's employment with GES, Miller worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

71.    Plaintiff Moffett worked for GES from on or about May 23, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Moffett is owed at least $58,200. Furthermore, during one or more workweeks during Moffett's employment with GES, Moffett worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

72.    Plaintiff Moutsanides worked for GES from on or about February 10, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Moutsanides is owed at least $47,000. Furthermore, during one or more workweeks during Moutsanides's employment with GES, Moutsanides worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

73.    Plaintiff Olivo worked for GES from on or about March 21, 2022 to on or about March 13, 2023 as a field inspector. Pursuant to the GES bonus structure, Olivo is owed at least $8,000 for Q1 and Q2 2023. Furthermore, during one or more workweeks during Olivo's employment with

GES, Olivo worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

74.     Plaintiff Potts worked for GES from on or about May 31, 2022 to on or about January 4, 2023 as a field inspector. Pursuant to the GES bonus structure, Potts is owed at least $39,000. Furthermore, during one or more workweeks during Potts's employment with GES, Potts worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

75.     Plaintiff Romero, Jr. worked for GES from on or about May 23, 2022 to on or about March 13, 2023 as a field inspector. Pursuant to the GES bonus structure, Romero, Jr. is owed at least $47,000. Furthermore, during one or more workweeks during Romero, Jr.'s employment with GES, Romero, Jr. worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

76.     Plaintiff Rudolph worked for GES from on or about May 23, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Rudolph is owed at least $55,000. Furthermore, during one or more workweeks during Rudolph's employment with GES, Rudolph worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

77.     Plaintiff Ruhoff worked for GES from on or about March 21, 2022 to on or about March 13, 2023 as a field inspector. Pursuant to the GES bonus structure, Ruhoff is owed at least $27,000. Furthermore, during one or more workweeks during Ruhoff's employment with GES, Ruhoff worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

78.     Plaintiff Washington worked for GES from on or about February 9, 2022 to on or about April 28, 2023 as a field inspector. Pursuant to the GES bonus structure, Washington is owed at least $78,000. Furthermore, during one or more workweeks during Washington's employment with GES, Washington worked more than 40 hours in a workweek and was not paid an overtime premium for all hours over 40 in each such workweek.

**Individual liability under the FLSA**

79.     Garibay was the General Manager of GES and was directly involved in its daily operations. Upon information and belief, Garibay also served as a conduit for the directives and messages of the other defendants in this case, and worked under their supervision in executing the daily operations of GES and the fraud alleged by the Plaintiffs in this case. Garabay herself engaged in direct supervision of the Plaintiffs in this case, and exercised control over the working conditions and work schedules of the Plaintiffs.

80.     Upon information and belief, ARS Vice President of Global Operations Nathan Normoyle was directing GES management decisions through Garibay and acted as President of GES. Normoyle was intimately involved in the hiring of certain Plaintiffs in this case. Normoyle had the power to hire and fire at GES, supervise and control work schedules and conditions of employment of the Plaintiffs, determine the rate and method of payment of the Plaintiffs, and maintain employment records of GES.

81.     Upon information and belief, ARS Director of Field Operations Michael Needham was also directing GES management decisions through Garibay. Needham was intimately involved in the hiring of certain Plaintiffs in this case. Needham had the power to hire and fire at GES, supervise and control work schedules and conditions of employment of the Plaintiffs, determine the rate and method of payment of the Plaintiffs, and maintain employment records of GES.

82.     Upon information and belief, ARS President Guiseppe "Joe" Gagliano was also directing GES management decisions through Garibay and the ARS executive team. Gagliano was intimately involved in the hiring of certain Plaintiffs in this case. Gagliano had the power to hire and fire at GES, supervise and control work schedules and conditions of employment of the Plaintiffs, determine the rate and method of payment of the Plaintiffs, and maintain employment records of GES.

**Additional monetary losses**

83.     The final paychecks of Plaintiffs Jochum and Moutsanides each contained an unlawful deduction of $300. Neither Jochum nor Moutsanides authorized these deductions by a writing bearing their signature as required by Texas law.

## V.  CAUSES OF ACTION

### Cause of Action 1: Breach of Contract (GES and ARS)

84.     Incorporating the facts alleged above, Plaintiffs allege that Defendant GES breached its contract with Plaintiffs by failing to pay all bonuses earned by Plaintiffs through their performance, thereby causing Plaintiffs damages. Plaintiffs Jochum and Moutsanides further allege that GES failed to pay $300 of the final salary payment due to each individual, as part of an unlawful deduction exercised by GES. These deductions were also violations of Texas Labor Code § 61.018(3). Plaintiffs seek the amount of unpaid bonuses and unlawfully withheld compensation due, as well as any consequential or special damages, pre- and post-judgment interest, attorney fees, and costs. Defendant ARS bears equal liability for any liabilities of GES due to the fact that GES was in fact the alter ego of ARS.

### Cause of Action 2: Unjust Enrichment and Quantum Meruit (GES and ARS)

85.    In the event that the Court finds that there is no contract between the parties on the subject matter of their claims, Plaintiffs contend that Defendant GES would be unjustly enriched by allowing GES to retain the compensation earned through the efforts of its field inspectors, who executed their duties in reliance on GES's representations concerning incentive compensation. Plaintiffs seek the amount of unpaid bonuses, as well as any consequential or special damages, pre- and post-judgment interest, attorney fees, and costs. In addition to and in the alternative, Plaintiffs claim the bonus amounts in *quantum meruit.* Defendant ARS bears equal liability for any liabilities of GES due to the fact that GES was in fact the alter ego of ARS.

### Cause of Action 3: Promissory Estoppel (GES and ARS)

86.    Furthermore and in the alternative, Defendant GES should be promissorily estopped from retaining Plaintiffs' bonuses. GES issued promises to Plaintiffs concerning their prospective bonuses, including Normoyle's promise that the bonus would be twice their salary, and it was reasonably foreseeable that Plaintiffs would rely on the promises to take the position and perform in the manner by which they would work toward the bonuses based on such promises. Plaintiffs ultimately substantially relied on the promises to their detriment, in both substantially performing and completing work toward the bonuses that were promised to them. The bonus promise was a unilateral offer that Plaintiffs accepted by performance. Therefore, they are rightfully entitled to the bonuses that they earned from their work in reliance on those promises.

### Cause of Action 4: Tortious Interference with a Contract (ARS)

87.    In the event that Defendant GES is found not to be the alter ego of ARS, and therefore ARS is deemed to be an independent actor for purposes of liability in this case, ARS tortiously interfered with Plaintiffs' contracts with GES by directing GES to not pay bonuses to the Plaintiffs or otherwise conform to its pay obligations with respect to the Plaintiffs, and therefore cause GES to

breach its agreements with the Plaintiffs. ARS was well aware of the contracts between GES and the Plaintiffs and, despite that knowledge, willfully and intentionally interfered with those contracts by directing GES not to comply with them. ARS's interference was the proximate cause of damages claimed by the Plaintiffs in this suit resulting from GES's breach of their pay agreements. Plaintiffs claim all damages available by law, including economic damages, mental anguish damages, punitive damages, pre- and post-judgment interest, and costs.

### Cause of Action 5: Overtime Violations under the Fair Labor Standards Act (all Defendants)

88.     During the three years prior to the filing of this complaint, all Defendants violated the FLSA, including 29 U.S.C. §§ 206-7 and 215(a)(2), by employing these employees in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA as previously stated, where such employees worked in multiple workweeks for more than 40 hours in each such workweek, without Defendants compensating these employees for all of their compensable work in excess of forty hours per week at rates no less than one-and-a-half times the regular rates for which they were employed. Plaintiffs are not exempt from the overtime provisions of the Fair Labor Standards Act. Defendants have acted willfully in failing to pay Plaintiffs in compliance with the FLSA. Plaintiffs are entitled to their unpaid overtime wages, liquidated damages in an amount equal to such unpaid overtime wages, attorney fees, court costs, and pre- and post-judgment interest. Plaintiffs further contend that GES and ARS were engaged in a joint enterprise and should be considered jointly for purposes of FLSA applicability and liability.

### VI.  ADDITIONAL LEGAL CONTENTIONS

89.     To the extent that GES claims that a bonus was not earned by a field inspector, such Plaintiff would contend that they engaged in substantial performance under the bonus agreement as to the work qualifying them for the bonus. Such Plaintiff would also contend that the bonus

agreement was a unilateral offer that was accepted by the Plaintiff's performance of the qualifying estimating work and completion of calendar quarters with qualifying customer and site inspection performance, and no terms of the bonus agreement allowed GES to withhold bonuses altogether once performance had been rendered. Plaintiffs further contend that GES has waived any such contentions based on their statements and assurances to Plaintiffs concerning the future payment of their bonuses following the issuance of the written bonus structure. The acts and omissions of Defendant GES are the acts and omissions of Defendant ARS due to the fact that GES was in fact the alter ego of ARS.

90.     To the extent that GES claims that an event has yet not occurred that entitles GES to withhold Plaintiffs' bonuses until such event occurs, Plaintiffs would contend that GES's action is based on a condition precedent unrelated to a Plaintiff's performance, and such condition precedent is not a material performance condition to such Plaintiff's right to their claimed bonuses otherwise earned for completed performance under the bonus agreement. The acts and omissions of Defendant GES are the acts and omissions of Defendant ARS due to the fact that GES was in fact the alter ego of ARS.

91.     To the extent that the written bonus plan eventually issued by GES modifies the terms of an original bonus agreement made verbally or in writing to a Plaintiff, the written bonus plan constitutes a modification of the original agreement.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Court:

    a. assume jurisdiction of this action and cite Defendants to appear;

b. award Plaintiffs all damages requested above, including economic, consequential, compensatory, and punitive damages as allowed by law, as well as liquidated damages under the FLSA, and attorney fees;

c. award Plaintiffs costs, expert witness fees, and attorney fees;

d. award Plaintiffs pre- and post-judgment interest at the highest rates allowed; and

e. award Plaintiffs any such other relief as the Court may deem proper.

Respectfully submitted,

**Kerry V. O'Brien**
Texas Bar No. 24038469
Board Certified in Labor & Employment Law by the TBLS



1011 Westlake Drive
Austin, Texas 78746
email: ko@obrienlawpc.com
phone: (512) 410-1960
fax: (512) 410-6171

**COUNSEL FOR PLAINTIFFS**